MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

STEPHEN MEYER (CABN 263954)
DANIEL KALEBA (CABN 223789)
Assistant United States Attorney

   150 Almaden Boulevard, Suite 900
   San Jose, CA 95113
   Telephone: (408) 535-5032
   E-Mail: Stephen.Meyer@usdoj.gov
           Daniel.Kaleba@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | ) | CASE NO. 12-CR-0723 EJD |
|---|---|---|
| v. | ) ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| VICTOR RODRIGUEZ, | ) ) | |
| Defendant. | ) ) ) ) | |

**PRELIMINARY STATEMENT**

      The defendant Victor Rodriguez is scheduled to appear before the Court on January 29, 2015, to be sentenced on his guilty plea to the following counts in the Superseding Indictment: Racketeering Conspiracy, including conspiracy to commit murder (Count 1), Possession/Use of a Firearm During and in Relation to a Crime of Violence (Count 5), Use of a Firearm in Furtherance of a Crime of Violence Resulting in Murder (Count 6) and Distribution of Methamphetamine (Count 7). The government

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

1

respectfully submits this sentencing memorandum to request that the Court sentence defendant Rodriguez to the high end of the applicable United States Sentencing Guidelines ("Guidelines"), which is a term of imprisonment of 485 months.

As set forth in more detail in the PSR, defendant Rodriguez committed two particularly violent crimes as part of his participation in the charged RICO conspiracy: (1) the 2009 armed home invasion robbery of a family in which a couple and their two children were bound, beaten and threatened with death; and (2) the 2013 shooting death of an unarmed young man who was standing in his driveway in San Jose at 4pm in the afternoon because the defendants perceived the victim as a rival gang member and the defendants were hunting for rival gang members who had been disrespecting their gang's territory with graffiti. In fact, the victim was not a gang member. On the day he was murdered by the defendant, the victim had just arrived home from the veterinarian with his girlfriend and their sick dog.

In addition, as part of his ongoing gang activity, defendant Rodriguez possessed multiple handguns, sold crystal methamphetamine, and attended monthly gang meetings where he paid dues used to buy guns for the gang and discussed gang business.

For the reasons that follow, the government believes that a sentence of no less than 485 months is necessary to achieve the goals of sentencing.

**ARGUMENT**

**I. OFFENSE CONDUCT**

The United States Probation Department's Presentence Investigation Report ("PSR") provides a detailed account of all of defendant Rodriguez's offense conduct. The government therefore will only summarize some of the conduct here.

A. <u>Gang Criminal Conduct Generally</u>

From at least 2009, defendant Rodriguez was a member of a Sureño gang in San Jose (the "Colonias/VTG Gang") and went by the moniker "Silencer." The primary illegal activities of the Colonias/VTG Gang were violent crimes against Norteño gangs (including murder), possession and use of firearms, narcotics trafficking, and armed robberies, including home invasion robberies. The gang pooled money to buy guns for the gang and those guns were passed around to fellow gang members who

were instructed to "put in work," meaning assault and kills Norteños.

B. The 2009 Home Invasion Robbery

On the night of February 14, 2009, defendant Rodriguez, along with four other gang members, conducted an armed home-invasion robbery in Ceres, California. After breaking through a window and gaining entry into the house, one of the robbers pointed a pistol at one of the residents of the house (a 35-year-old father of two children). The victim-father was ordered at gunpoint to get on the floor and place his hands behind his back at which point he was tied up with duct tape. Hearing her father scream, the victim's 13-year old daughter came downstairs and saw her bound father being kicked in the head by defendant Rodriguez. One of the other robbers pointed a gun at her and she fled back upstairs and took refuge in a bedroom with her five-year old sister. The robbers forced the bedroom door open and threatened to kill the girls' father if they did not comply with their commands to come with them downstairs.

The robbers ransacked the house and demanded to know where drugs were hidden. The victims stated that they had no drugs, and the victim-father pleaded with the robbers not to shoot his daughters. The victim-father's wife arrived home a short time later and was punched by a robber and another robber held a gun to her head. At one point, defendant Rodriguez encouraged a fellow robber to shoot the victim-father in the head, but he did not.

When the robbers figured out they had the wrong house and that there were no drugs, the robbers stole electronics, jewelry, various other items, and the family's car. The robbers left the victim family members tied up in the house and warned them not to call the police or the robbers would return and kill them. The family members eventually freed themselves from the duct tape bindings and called the police. Defendant Rodriguez and three of the four other suspects were arrested the next day hanging out at a motel in San Jose. After spending nearly three years in jail awaiting trial, the case against defendant Rodriguez was dismissed due to exculpatory statements on behalf of defendant Rodriguez by one of the other robbers. Obviously, these exculpatory statements turned out to be false.

//

//

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

C.  <u>The 2013 Homicide</u>

On the afternoon of August 13, 2012, defendant Rodriguez was riding in a Mustang driven by co-defendant and fellow gang member Jose Barajas. They were driving around in an area near the boundary of Colonias/VTG Gang territory looking for Norteños, because Norteños had recently been "tagging" (gang graffiti) in the defendants' gang's territory. As Barajas slowly drove through the residential neighborhood, Rodriguez was in the front-passenger seat armed with a .38 caliber revolver. Barajas knew that Rodriguez had the gun. Rodriguez and Barajas spotted Victor Mendoza, a 21-year-old Hispanic male, standing alone in the driveway in front of his house. Mendoza had just arrived home with his girlfriend after taking their dog to the veterinarian. The defendants saw that Mendoza, whom they did not know, was wearing red clothing and believed that he was a Norteño gang member. After passing the house, Rodriguez directed Barajas to make a U-turn and drive the car back to where Mendoza was standing. Barajas made the U-turn and stopped in the street in front of Mendoza's driveway. Rodriguez told Barajas, "this guy is going to die right now," and got out of the car with his revolver. Defendant Rodriguez pulled out the gun, and shot at Mendoza twice, hitting him once in the face at close range. Mendoza was standing at the bottom of his driveway within a few feet of Rodriguez and immediately dropped when he was shot. Mendoza was unarmed and did not have a chance to flee before being shot. Defendant Rodriguez returned to the car and started laughing, and Barajas drove away. Victim Mendoza was found by his girlfriend a few minutes later lying in the driveway unconscious, but still breathing and moaning loudly. Mendoza died two days later.

Rodriguez cleaned the murder weapon, burned his clothes and eventually passed the revolver to another gang member who was a minor. The gun was recovered by local law enforcement during a car stop a few days later in which the minor and two adult females were driving in a car in San Jose.

D.  <u>Other Specific Criminal Conduct by Rodriguez on Behalf of the Gang</u>

Approximately one month after the murder, defendant Rodriguez sold methamphetamine to a confidential informant working with the FBI. A few months prior to this deal, the CI had identified defendant Rodriguez as a Sureño gang member who sold methamphetamine, and identified co-defendant Barajas as a Sureño gang member who acted as a middle man for drug deals. Co-defendant Barajas had

referred the CI to Rodriguez for this particular drug deal. During that drug deal, Rodriguez bragged that he was going to get a tattoo of "NK," for Norteño Killer, on his neck. A few days later, at the direction of the FBI, the CI invited Rodriguez and co-defendant Barajas to assist him to transport a car that supposedly contained cocaine.[1] During that drive, Rodriguez described the murder and how he cleaned the gun and burned his clothes afterward. Rodriguez stated it was not his first shooting, so he knew how to destroy evidence. Later in the drive, Rodriguez recounted how he had been approached by another Sureño gang member to do a "mission" to kill a *Nuestra Familia* member who lived at a location out of town.

At the time of defendant Rodriguez's arrest, which was just over two weeks after Rodriguez sold methamphetamine to the CI, Rodriguez's residence was searched and a loaded handgun and methamphetamine were found inside, along with drug packaging materials and a digital scale.

Defendant Rodriguez has remained in custody since his arrest on this case. Approximately a year after his arrest on this case, the FBI received information that defendant Rodriguez was making arrangements to smuggle drugs into the jail and that Rodriguez had risen in the ranks among the Sureño gang members. The Santa Clara County Jail's gang intel unit has separately advised the Probation Officer preparing the PSR that defendant Rodriguez has become "an influential Sureño in the jail." As intended, Rodriguez's murder of a perceived Norteño gang member has enhanced Rodriguez's standing within not only his gang, but with other Sureño gang members as well.

//
//
//
//
//
//

---

[1] Prior to this trip where both Barajas and Rodriguez accompanied the CI, co-defendant Barajas accompanied the CI on a prior trip with the same purpose. During that trip, Barajas discussed the murder and he was paid for assisting the CI in transporting the drug-loaded vehicle. Thereafter, Barajas contacted the CI on multiple occasions to request an opportunity to make more money doing the same work.

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

## II. SENTENCING GUIDELINES CALCULATION

As the Court is aware, it must correctly apply the Sentencing Guidelines and then consider the factors laid out in 18 U.S.C. § 3553(a) to arrive at the appropriate sentence. *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006). Although the Guidelines are not binding, "it is fair to assume that they, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 349 (2007). The Guidelines "provide uniformity, predictability, and a degree of detachment lacking in our earlier system." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The parties agree that the defendant is in Criminal History Category I, his Total Offense Level is 40 for Counts 1 and 7, and that a consecutive term of 10 years is applicable for Counts 5 and 6 (these two counts merge). Thus, the applicable Guidelines range is 412 to 485 months. Pursuant to the plea agreement, the parties agreed not to argue for a sentence outside this Guidelines range.

As pointed out in the PSR, the Total Offense Level is arrived at based on the murder offense conduct, and the offense level is unaffected by the robbery conduct or the drug trafficking conduct to which the defendant has admitted. This is one of the reasons that the government is recommending a sentence at the top of the applicable Guidelines range, which is 485 months.

## III. OTHER SECTION 3553(a) FACTORS

### A. Nature and Circumstances of the Offense & Characteristics of the Defendant

The sentence imposed must reflect "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

1. Nature and Circumstances of the Offense

Admissions in the plea agreement and source reporting establish that since at least 2009, the defendant has been an active Sureño gang member, and remains one to this day. As set forth in more detail in the admissions contained in the plea agreement, being an active Sureño gang member includes:

(1) coordinating and engaging in criminal activity together with fellow Sureños such as drug dealing, robberies and other violent crimes;

(2) fighting Norteños for control of territory in which to (a) conduct narcotics trafficking

and other crimes, (b) assert their gang identity and gain notoriety as a powerful gang that is not to be challenged, and (c) recruit and influence non-gang members; and

(3) confronting and attacking any suspected Norteño encountered.

As a member of his specific Sureño clique (the Colonias/VTG Gang Enterprise), defendant Rodriguez attended gang meetings approximately once a month where members had to pay dues and were checked off on a list of members. The dues were used to buy firearms for the gang. During the meetings, current gang activities and priorities were discussed, such as defending the territory against encroachment by Norteños and the need for younger members and associates to "put in work" (*i.e.*, to engage in violence against Norteños and to sell drugs). To facilitate "putting in work," firearms were passed among gang members who were expected to use the guns to carry out the gang's activities, typically attacking Norteños, and then passed on to a fellow gang member so they could do the same. Sometimes new members were "jumped in" at the meetings, which was an initiation ritual that involved the new member being assaulted by three gang members for a count of 13 seconds.

As set forth in the plea agreement, defendant Rodriguez admits that from at least 2009, he agreed that Colonias/VTG Gang Enterprise members would commit multiple acts of racketeering in the conduct of the affairs of the Colonias/VTG Gang Enterprise, including acts involving: (i) murder, conspiracy to commit murder, and attempted murder; (ii) conspiracy to distribute and to possess with the intent to distribute controlled substances, and distribution and possession with intent to distribute controlled substances; and (iii) robbery and attempted robbery.

In carrying out this RICO conspiracy, in August 2013 defendant Rodriguez shot and killed victim Mendoza as he stood in his driveway at 4 p.m. in the afternoon. For some time prior to the shooting, Rodriguez was riding around in a car carrying a .38 caliber revolver and hunting for rival Norteños who had been spray painting their gang graffiti on the defendants' gang's turf. Upon seeing victim Mendoza, the defendants thought he was a Norteño and Rodriguez directed co-defendant Barajas to make a U-turn, which he did. Barajas then stopped the car right in front of victim Mendoza's driveway, and defendant Rodriguez exited the car, pulled out the .38 caliber revolver that he had been carrying on his person, and shot Mendoza once in the head at close range. After shooting the victim in

the head, Rodriguez reentered Barajas's car and laughed about the shooting. The defendant later bragged to his fellow Sureño gang members about the shooting.

Also as part of the RICO conspiracy, defendant Rodriguez also participated in an armed home-invasion robbery in Ceres, California, in February 2009. After breaking into the victims' home with four other gang members, defendant Rodriguez kicked the victim-father in the face in front of at least one of his two children (ages 5 and 13) after the victim-father was tied up. Rodriguez also encouraged a fellow robber who was armed with a gun to shoot the victim-father in the head, which the other robber did not do. By the time the gang of robbers left, the victim-father and his wife had been physically assaulted and the entire family was left tied up. Before leaving, the robbers threatened to come back and kill the victims if they reported the robbery to the police.

As a further aspect of the RICO conspiracy, the defendant possessed multiple handguns, including the firearm he used to commit the murder, and distributed methamphetamine. On one occasion, the defendant sold approximately a half ounce of crystal methamphetamine to a confidential informant working with the FBI. This was not an unusual circumstance for the defendant, since he had been identified by the CI as a gang member who sold methamphetamine months prior to this transaction. When he was arrested, a search of the defendant's residence revealed additional methamphetamine, drug packaging materials and a loaded 9mm pistol.

2.   History and Characteristics of the Defendant

Although defendant Rodriguez's history of prior convictions is quite sparse – a single misdemeanor conviction for possession of methamphetamine in May 2012 – this is due in large part to his incarceration from early 2009 until nearly the end of 2011 while awaiting trial for the home-invasion robbery for which he was never convicted. If his prior robbery crime was to be considered as part of his criminal history, rather than part of the instant offense conduct, defendant Rodriguez would be in Criminal History Category III. Although incapacitated from committing additional crimes from 2009 through 2011, Rodriguez continued to demonstrate his commitment to the gang by adorning his body with a number of gang-related tattoos. Based upon his actions after released from jail, it is clear that absent this period of incarceration, Rodriguez would have committed additional violent gang crimes in

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

San Jose during that time period.

In evaluating the history and characteristics of this defendant, the government encourages the Court to consider the divergence between Rodriguez and his siblings. Although defendant Rodriguez's father has been incarcerated for almost all of Rodriguez and his siblings' lives, the family always had sufficient economic resources thanks to the defendant's mother's income. Both of Rodriguez's siblings live in Mexico and have no noted criminal history (his sister is two years younger than him and attends a university in Mexico; his brother is four years younger than him and works in Mexico). As an adult, Rodriguez lived with various relatives in the United States and found work in sheet rock, computer assembly, and eventually air conditioning work.

Importantly, defendant Rodriguez did not become involved in gangs until approximately age 20, when he moved to San Jose, California. He quickly became entrenched in the gang life by choice as an adult soon after being exposed to it. This stands in sharp contrast to many individuals who grow up in neighborhoods infested by gangs and choose to become involved in the gangs in their early teens, if not earlier. Rodriguez knew a different way to live and work, but he chose to become a gang member and dedicate himself to gang violence as a young adult.

**B.     Seriousness of the Offense, Respect for the Law & Just Punishment**

The sentence also must reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A).

Defendant Rodriguez committed the most serious crime possible: murder. It was a crime he had dedicated himself to commit over a long period of time as a gang member.[2] It was a crime he committed even after spending nearly three years in jail awaiting trial for committing a violent home-invasion robbery. The murder was the result of the defendants' hunt for gang rivals (Norteños) to retaliate against for tagging gang graffiti in the defendants' gang's territory. Defendant Rodriguez

---

[2] As a Sureño gang member he committed to attack and kill rival Norteños generally, but he also separately committed to it in a prior murder plot against a specific NF member and he bragged that the murder of victim Mendoza was not the first shooting he did and therefore he knew how to clean the gun and destroy the clothes he wore. (PSR ¶ 26). Murder was on his mind so much that he stated that he would "always tell the homies: 'don't seek out to kill anybody, it is going to come. When it is your turn to try it yourself, the opportunity is going to come all by itself.'" (PSR ¶ 26).

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

himself did the shooting, striking the victim in his head with a single shot at close range. After shooting the victim in the head from a few feet away, defendant Rodriguez laughed about killing the victim. Later, on multiple occasions, Rodriguez bragged to his fellow Sureño gang members about the homicide.

The ongoing nature of defendant Rodriguez's criminal activity, and the particularly violent crimes he is known to have directly committed, demand a weighty sentence to promote respect for the law and to provide just punishment.

### C. The Need for Specific & General Deterrence

The sentence must advance specific and general deterrence as well. *See* 18 U.S.C. § 3553(a)(2)(B), (C). A substantial sentence of imprisonment is needed to advance general deterrence. Defendant Rodriguez's family or friends may be present at the sentencing. Because Rodriguez is a prominent gang leader, others not present will hear about his sentence as well, especially those already incarcerated with him in the Santa Clara County Main Jail. Whatever prison term the Court selects will be discussed in Sureño gangs in San Jose for years to come. The sentence should make clear that the federal government, and federal courts, will not tolerate gang violence.

In terms of specific deterrence, defendant Rodriguez has already proven difficult to deter. After spending nearly three years in jail awaiting trial for the Ceres home-invasion robbery, Rodriguez emerged as devoted to the gang's violent crimes as ever. He actively participated in gang meetings, possessed multiple firearms, trafficked methamphetamine, and, less than nine months after leaving a jail stay of nearly three years, he shot and killed Mendoza in the middle of the afternoon because he looked like a Norteño.

Even after being arrested on the instant case, defendant Rodriguez has continued his gang activities in custody, including coordinating the smuggling of controlled substances into the jail. He has also reportedly risen in status among the Sureños in jail and is considered an "influential Sureño in jail" by the jail's gang-intel unit.

Moreover, Rodriguez's recent statements accepting responsibility for his crimes are littered with excuses for his conduct. He claimed that he committed the offenses, including the home-invasion

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

10

robbery, "because they were expected of me as a Sureño gang member." Yet, the offense conduct demonstrated that Rodriguez was among the more violent perpetrators in that robbery – kicking the victim-father in front of his children and encouraging a fellow robber that was holding a firearm to shoot the victim-father in the head with the gun. As for his drug dealing, Rodriguez stated, "I usually didn't deal meth, but the confidential informant asked me personally if I could get him some." Yet, months prior to the homicide, the CI had identified defendant Rodriguez as a seller of methamphetamine and co-defendant Barajas as someone who acted as a middle man for drug trafficking. Moreover, when defendant Rodriguez was arrested and his residence was searched in October 2013, law enforcement found methamphetamine, plastic bags, a digital scale, a loaded handgun, and containers with drug residue.

In his statement of responsibility for the murder, defendant Rodriguez claims he shot the victim "because I thought that he would kill me if I didn't act first." Yet again, the offense conduct contradicts Rodriguez's claim. The victim was standing in his own driveway in the middle of the afternoon when defendant Rodriguez and co-defendant Barajas drove by him. Rodriguez directed Barajas to make a U-turn, which he did, and Rodriguez said that the victim was going to die before exiting the vehicle and shooting the unarmed victim in the head. The fact that the defendants were in a car "hunting," and actually turned the car around to approach victim Mendoza who was standing alone in his driveway completely discredits Rodriguez's claim that he was concerned that he would be killed if he did not shoot the victim first.

In deciding how long a sentence is necessary to specifically deter this defendant, the Court should consider how old defendant Rodriguez will be when released on such a sentence. If the Court sentences defendant Rodriguez to the 485 months recommended by the government, he will be approximately 55 years old when he is released from custody.[3] The government believes that if Rodriguez is released at an earlier age, he will represent a significant danger to the community.

---

[3] This calculation factors in that inmates only typically serve 85% of the sentence imposed due to Bureau of Prison regulations regarding good behavior (effectively reducing a 485 month sentence to 412 months), as well as the credit for time served in state custody on the Ceres home-invasion robbery (34 months). Of the 378 months to serve, he has been in custody on the instant case since October 3, 2012, and therefore by the time he is sentenced at the end of January 2015 he will have already served 28 months leaving 350 months (approximately 29 years) to serve.

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

## CONCLUSION

For all of the foregoing reasons, the government respectfully recommends that the Court sentence the defendant at the high end of the applicable Guidelines range, which is 485 months imprisonment. The government also recommends a five-year supervised release term and a $400 Special Assessment.

Dated: January 9, 2015

Respectfully submitted,

MELINDA HAAG
United States Attorney

/s/
STEPHEN MEYER
DANIEL KALEBA
Assistant United States Attorneys