MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

STEPHEN MEYER (CABN 263954)
DANIEL KALEBA (CABN 223789)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, CA 95113
    Telephone: (408) 535-5032
    E-Mail: Stephen.Meyer@usdoj.gov
            Daniel.Kaleba@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 12-CR-0723 EJD |
| v. | ) GOVERNMENT'S SENTENCING MEMORANDUM |
| JOSE BARAJAS, | ) |
| Defendant. | ) |

## PRELIMINARY STATEMENT

    The defendant Jose Barajas is scheduled to appear before the Court on May 21, 2015, to be sentenced on his guilty plea to the following counts in the Superseding Indictment: Racketeering Conspiracy, including conspiracy to commit murder (Count 1), Possession/Use of a Firearm During and in Relation to a Crime of Violence (Count 5), Use of a Firearm in Furtherance of a Crime of Violence Resulting in Murder (Count 6) and Distribution of Methamphetamine (Count 7). The government respectfully submits this sentencing memorandum to request that the Court sentence defendant Barajas to the low end of the applicable United States Sentencing Guidelines ("Guidelines"), which is a term of

1   imprisonment of 444 months (324 months for counts 1 and 7, and a mandatory consecutive term of 120

2   months for counts 5 and 6).

3       As set forth in more detail in the United States Probation Department's Presentence Investigation

4   Report ("PSR"), defendant Barajas participated in the 2012 shooting death of an unarmed young man

5   who was standing in his driveway in San Jose at 4pm in the afternoon.  The victim was shot because the

6   defendants perceived the victim as a rival gang member and the defendants were hunting for rival gang

7   members who had been disrespecting their gang's territory with graffiti.  In fact, the victim was not a

8   gang member.  On the day he was murdered by the defendants, the victim had just arrived home from

9   the veterinarian with his girlfriend and their sick dog.

10      Two years prior to the murder, defendant Barajas also participated in a violent gang assault in

11  Mountain View in November 2010.  Since officially becoming a gang member in 2010, Barajas

12  regularly attended monthly gang meeting where he and fellow members paid dues to buy guns for the

13  gang and they passed around firearms so that members could use them to "put in work."  After the 2012

14  murder, the murder weapon was passed to a juvenile gang member who Barajas assisted in chasing after

15  rival Norteño gang members that they had encountered near a liquor store.  Finally, as part of his

16  ongoing gang activity, defendant Barajas acted as a middle man for crystal methamphetamine

17  trafficking, including a sale by his co-defendant to the FBI confidential informant (the "CI").

18      For the reasons that follow, the government believes that a sentence of no less than 444 months

19  is necessary to achieve the goals of sentencing.

20                                          **ARGUMENT**

21  **I.    OFFENSE CONDUCT**

22          A.  Gang Criminal Conduct Generally

23      From at least 2010, defendant Barajas was a member of a Sureño gang in San Jose (the

24  Colonias/VTG Gang) and went by the moniker "Oso," which means "bear."  The primary illegal

25  activities of the Colonias/VTG Gang were violent crimes against Norteño gangs (including murder),

26  possession and use of firearms, narcotics trafficking, and armed robberies, including home invasion

27  robberies.  The gang pooled money to buy guns for the gang and those guns were passed around to

28

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

fellow gang members who were instructed to "put in work," meaning assault and kills Norteños.  A video posted to YouTube in January 2012 depicts Barajas among the dozen gang members in the video, which features a series of photos of gang members flashing gang signs and photos of guns and knives set to rap music with lyrics about shooting rival gang members.  The gang also trafficked in methamphetamine.  Barajas was not known to sell drugs himself, but would act as a middleman for drug transactions.

### B.  The 2010 Gang Assault with a Deadly Weapon

On November 28, 2010, defendant Barajas was among a group of 15 Sureño gang members from San Jose that traveled to Mountain View and attacked several other gang members.  The 15 gang members went to Mountain View in at least two separate vehicles: a minivan with Barajas and seven others, and an SUV with seven other Sureño gang members.  During the attack, the men attacked the two of the victims using bats and similar striking weapons.  These two victims suffered head injuries and other blunt trauma, which required them to go to the hospital.  Based on descriptions of the suspects vehicles, within minutes of the attack the police located the 15 suspects inside two vehicles.  In the minivan that Barajas was inside as a passenger with seven other gang members, the police found seven different weapons, including several knives, golf clubs, an aluminum baseball bat, and a metal rod.  The police separately found the other vehicle with seven gang members, but did not locate any weapons in that vehicle.

All 15 men were charged with assault with a deadly weapon.  Eventually the charges against Barajas were dismissed for unknown reasons.

### C.  The 2012 Homicide

1.  Barajas Drove an Armed Rodriguez in Search of Rival Norteño Gang Members.

On the afternoon of August 13, 2012, defendant Barajas was driving his Mustang and accompanied by co-defendant and fellow gang member Victor Rodriguez.  They were driving around in an area near the boundary of Colonias/VTG Gang territory looking for Norteños, because Norteños had recently been "tagging" (gang graffiti) in the defendants' gang's territory.  As Barajas slowly drove through the residential neighborhood, Rodriguez was in the front-passenger seat armed with a .38 caliber

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

revolver.  Barajas knew that Rodriguez had the revolver on his person.

Rodriguez and Barajas spotted Victor Mendoza, a 21-year-old Hispanic male, standing alone in the driveway in front of his house.  Mendoza had just arrived home with his girlfriend after taking their dog to the veterinarian.  The defendants saw that Mendoza, whom they did not know, was wearing red clothing and believed that he was a Norteño gang member.  After passing the house, Rodriguez directed Barajas to make a U-turn and drive the car back to where Mendoza was standing.  Barajas made the U-turn and stopped in the street in front of Mendoza's driveway.  Rodriguez told Barajas, "this guy is going to die right now," and got out of the car with his revolver.  Defendant Rodriguez pulled out the gun, and shot at Mendoza twice, hitting him once in the face at close range.  Mendoza was standing at the bottom of his driveway within a few feet of Rodriguez and immediately dropped when he was shot. Mendoza was unarmed and did not have a chance to flee before being shot.  Defendant Rodriguez returned to the car and started laughing, and Barajas drove away.  Victim Mendoza was found by his girlfriend a few minutes later lying in the driveway unconscious, but still breathing and moaning loudly. Mendoza died two days later.

Rodriguez cleaned the murder weapon, burned his clothes and eventually passed the revolver to another gang member who was a juvenile.  The gun was recovered by local law enforcement during a car stop a few days later in which the juvenile and two adult females were driving in a car in San Jose.

### 2.     Barajas Bragged About the Murder.

The day after the shooting of Mr. Mendoza, Barajas discussed the details of the murder with the FBI's CI.  This was not a confession.  It was braggadocio, offered freely, voluntarily, and repeatedly. Barajas gave graphic details and was proud of what he had done.

On August 14 and 16, 2012, in a motel room in San Jose, Barajas recounted the facts and circumstances of the shooting.  He stated that the police did not know who was responsible for the murder.  He told the CI that he was confident that the civilians he saw in the neighborhood during the shooting would not say anything to the police.  He also claimed that the murder went smoothly, as if it had been planned out.

On August 29, 2012, Barajas met again with the CI.  He told the CI that Rodriguez still had the

1   "toy" (the .38 revolver used in the murder).  Barajas referred to the victim using a derogatory term.

2   Barajas also showed the CI a YouTube video that depicts Barajas among the dozen gang members in the

3   video, which features a series of photos of gang members flashing gang signs and photos of guns and

4   knives set to rap music with lyrics about shooting rival gang members.  On September 2, 2012, Barajas

5   met again with the CI, and told the CI that he was not worried about the two civilians in the

6   neighborhood who may have witnessed the shooting.

7          On September 4, 2012, law enforcement found the murder weapon in the possession of a

8   juvenile Sureño gang member who associated with Barajas.  Barajas later told the CI that the police had

9   recovered the murder weapon from the juvenile, and the juvenile would be regulated or physically

10  disciplined by the gang for losing the weapon to law enforcement.  He later advised the CI tha the

11  juvenile had in fact been assaulted as a form of gang discipline.

12         Starting in September, for the purpose of obtaining additional evidence against Barajas and

13  Rodriguez, the FBI through the CI, invited Barajas to assist with the delivery of cars he was told were

14  loaded with cocaine.  Barajas freely accepted the invitation to commit this additional criminal conduct.

15  In fact, Barajas was eager to participate.  The cars were wired to record the conversations, which

16  included additional discussions of the murder, as described below.

17         On September 12, 2012, approximately one month after the murder, the CI invited defendant

18  Barajas to assist him to transport a car that supposedly contained cocaine.  Barajas was paid $300 for his

19  assistance.  During the trip, Barajas recounted the homicide and they also discussed obtaining

20  methamphetamine from co-defendant Rodriguez for the CI.  Barajas discussed how the murder weapon

21  was recently recovered by the police from a juvenile gang member, but that Rodriguez had already

22  cleaned the gun after using it in the murder by inserting a drill inside the barrel.  Barajas said that on

23  September 3, 2012, he had driven the same juvenile gang member to an area where the juvenile chased

24  after some Norteños with the same .38 revolver, but failed to shoot at them.  Regarding the murder,

25  Barajas again discussed the civilians who lived in the neighborhood and were potential witnesses, and

26  how he was not scared about them because he knew where they lived (implying he or fellow gang

27  members could intimidate or retaliate against them if necessary).  Barajas claimed that the murder had

28

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

the intended deterrent effect because Norteños were no longer tagging in their neighborhood.  Barajas stated that Norteños now know that if they tag in Sureño territory, "they will get dropped."  Barajas connected the CI to Rodriguez for the purchase of a half-ounce of methamphetamine for $350, which was consummated a few days later.

On September 21, 2012, both Barajas and Rodriguez assisted the CI to transport another car that supposedly contained cocaine.  During that drive, Rodriguez described the murder and how he cleaned the gun and burned his clothes afterward.  Barajas also described the murder and how the victim collapsed when he was shot in the head.  Rodriguez stated it was not his first shooting, so he knew how to destroy evidence.  Later in the drive, Rodriguez recounted how he had been approached by another Sureño gang member to do a "mission" to kill a *Nuestra Familia* member who lived at a location out of town.  Barajas was an active participant in all of these conversations.

Barajas was regularly contacting the CI to do additional deliveries of vehicles with cocaine.  The CI advised him that there was nothing available at the time, but would involve him in the future.

## II.   SENTENCING GUIDELINES CALCULATION

As the Court is aware, it must correctly apply the Sentencing Guidelines and then consider the factors laid out in 18 U.S.C. § 3553(a) to arrive at the appropriate sentence.  *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006).  Although the Guidelines are not binding, "it is fair to assume that they, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *United States v. Rita*, 551 U.S. 338, 349 (2007).  The Guidelines "provide uniformity, predictability, and a degree of detachment lacking in our earlier system."  *Koon v. United States*, 518 U.S. 81, 113 (1996).

The parties agree that the defendant's Total Offense Level is 40 for Counts 1 and 7, and that a consecutive term of 10 years is applicable for Counts 5 and 6 (these two counts merge).  The defendant is in Criminal History Category II.  Thus, the applicable Guidelines range is 444 to 525 months.  Pursuant to the plea agreement, the government agreed not to argue for a sentence within the Guidelines range, but no higher than 480 months.

**III.    SECTION 3553(a) FACTORS**

    **A.    Nature and Circumstances of the Offense & Characteristics of the Defendant**

The sentence imposed must reflect "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

    1.    <u>Nature and Circumstances of the Offense</u>

Admissions in the plea agreement and source reporting establish that since at least 2010, the defendant was an active Sureño gang member.  As set forth in more detail in the admissions contained in the plea agreement, being an active Sureño gang member includes:

    (1) coordinating and engaging in criminal activity together with fellow Sureños such as drug dealing, robberies and other violent crimes;

    (2) fighting Norteños for control of territory in which to (a) conduct narcotics trafficking and other crimes, (b) assert their gang identity and gain notoriety as a powerful gang that is not to be challenged, and (c) recruit and influence non-gang members; and

    (3) confronting and attacking any suspected Norteño that he encounters.

As a member of his specific Sureño clique (the Colonias/VTG Gang Enterprise), defendant Barajas attended gang meetings approximately once a month where members had to pay dues and were checked off on a list of members.  The dues were used to buy firearms for the gang.  During the meetings, current gang activities and priorities were discussed, such as defending the territory against encroachment by Norteños and the need for younger members and associates to "put in work" (*i.e.*, to engage in violence against Norteños and to sell drugs).  To facilitate "putting in work," firearms were passed among gang members who were expected to use the guns to carry out the gang's activities, typically attacking Norteños, and then passed on to a fellow gang member so he can do the same.  Sometimes new members were "jumped in" at the meetings, which was an initiation ritual that involved the new member being assaulted by three gang members for a count of 13 seconds.

As set forth in the plea agreement, defendant Barajas admits that from at least 2010, he agreed that Colonias/VTG Gang Enterprise members would commit multiple acts of racketeering in the conduct of the affairs of the Colonias/VTG Gang Enterprise, including acts involving: (i) murder, conspiracy to

1  commit murder, and attempted murder; (ii) conspiracy to distribute and to possess with the intent to

2  distribute controlled substances, and distribution and possession with intent to distribute controlled

3  substances; and (iii) robbery and attempted robbery.

4       In carrying out this RICO conspiracy, in August 2012 defendant Barajas drove co-defendant

5  Rodriguez around hunting for rival Norteños who had been spray painting their gang graffiti on the

6  defendants' gang's turf.  Barajas knew that Rodriguez was armed with a .38 caliber revolver.  Upon

7  seeing victim Mendoza, the defendants thought he was a Norteño and Rodriguez directed Barajas to

8  make a U-turn, which he did.  Barajas then stopped the car right in front of victim Mendoza's driveway,

9  and Rodriguez exited the car, pulled out the .38 caliber revolver that he had been carrying on his person,

10 and shot Mendoza once in the head at close range.  After shooting the victim in the head, Rodriguez

11 reentered Barajas's car and laughed about the shooting.  The defendants later bragged to their fellow

12 Sureño gang members about the shooting.  Barajas also assisted a juvenile gang member who received

13 the murder weapon after the homicide, and that juvenile chased after rival Norteño gang members with

14 the murder weapon while he was with Barajas.

15      Also as part of the RICO conspiracy, defendant Barajas also participated in a gang assault with a

16 deadly weapon in Mountain View, California, in November 2010.  Barajas was one of 15 Sureño gang

17 members who traveled from San Jose to Mountain View and attacked other gang members with baseball

18 bats and similar striking weapons, which resulted in two victims going to the hospital.

19      As a further aspect of the RICO conspiracy, defendant Barajas acted as a middleman to assist in

20 the distribution of methamphetamine.  On one occasion, Barajas facilitated co-defendant Rodriguez's

21 sale of approximately a half ounce of crystal methamphetamine to the CI working with the FBI.  Barajas

22 also eagerly assisted the CI to transport vehicles he believed were loaded with drugs in a secret

23 compartment.

24              2.    History and Characteristics of the Defendant

25      Defendant Barajas's history of prior convictions consists of only two juvenile convictions, both

26 for Vehicle Theft.  Barajas has two other arrests for violent crimes, the gang assault in Mountain View

27 described above and a fight with his brother in 2011, neither of which resulted in convictions.

28

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

Barajas had a difficult home life growing up due to his father's drug use and violence.  At age 14, his parents permanently separated.  At age 16, Barajas began hanging around with members of the Colonias gang, and Barajas was formally "jumped in" to the gang at age 19.  From the age of 18 through the time of his arrest in this case, Barajas was employed as a maintenance worker for Corporate Care.

The defense commissioned a psychological evaluation, which was provided to Probation and the government.  The report concluded that Mr. Barajas meets the criteria for having an intellectual disability and that this is relevant in this case for four reasons: (1) he is unusually vulnerable to being exploited, persuaded, misled, or taken advantage of by others; (2) he has an impaired ability to accurately perceive other people's motives and intentions; (3) he has an impaired ability to foresee and consider the consequences of his actions; and (4) his desire to prevent people from discovering his intellectual disability leads him to pretend to have knowledge of comprehension that he lacks.

Despite the government's numerous requests to speak to the author of the psychological evaluation, the defense has not made him available in person or by phone.  Therefore, if the Court intends to rely on the findings of the report to impose a sentence below the applicable Guidelines range, then the government requests a hearing regarding the contents of the report.

Among the concerns the government has about the report are the following.  The author did not review audio and video recordings of the defendant and his discussion of his crimes with his co-conspirator and the CI.  These interactions appear to show a relationship that directly contradicts the notion that the defendant was possibly manipulated by others in this case or confused or surprised at any of the crimes that occurred.[1]  Similarly, the author did not review the defendant's own statements about the crime that were provided to law enforcement at the time of his arrest.  A related concern is that the author did not attempt to ask questions about the crimes in this case to see whether the defendant was actually manipulated by others, or confused or surprised at the results of his crimes.  The author seems

---

[1]  On page 27 of the report, there is a description of Barajas's social interaction with the author as being very reserved and that this behavior was typical of Barajas as reported to the author by others.  The government is providing to the Court for its consideration, a portion of the audio/video recording in which Barajas, his co-defendant, and the CI are in a car and discussing the murder.  This clip captures the social interactions of Barajas very clearly, and he is not reserved.  He often interrupts his co-defendant to clarify facts about the murder.  He appears very confident and comfortable.

1  content to conclude that Barajas is generally susceptible to manipulation, confusion, etc., while making

2  no attempt to determine if that happened here.  There are a number of other concerns the government

3  has with respect to specific statements in the report that it believes would necessitate an evidentiary

4  hearing if the Court intends to rely upon the report to sentence the defendant below the Guidelines.

5  **B.    Seriousness of the Offense, Respect for the Law & Just Punishment**

6  The sentence also must reflect the seriousness of the offense, promote respect for the law, and

7  provide just punishment.  18 U.S.C. § 3553(a)(2)(A).

8  Defendant Barajas committed the most serious crime possible: murder.  It was a crime he had

9  dedicated himself to commit over a long period of time as a gang member.[2]  It was a crime he

10  committed after committing another violent crime on behalf of the gang: the 2010 Assault with a Deadly

11  Weapon.  The murder was the result of the defendants' hunt for gang rivals (Norteños) to retaliate

12  against for tagging gang graffiti in the defendants' gang's territory.  While defendant Barajas did not

13  himself do the shooting, he knew co-defendant Rodriguez had a revolver and they were out hunting for

14  Norteños to attack.  When Rodriguez told Barajas to make a U-turn so they could go back to where they

15  had spotted their target standing in his driveway, Barajas understood that Rodriguez intended to attack

16  the victim and Barajas drove to that location to assist Rodriguez in that regard.  After Rodriguez shot the

17  victim in the head, Barajas drove off with Rodriguez.  Later, on multiple occasions, Barajas bragged to

18  his fellow Sureño gang members about the homicide.  In addition, after the homicide, Barajas assisted a

19  juvenile gang member that was armed with the same murder weapon.  That juvenile gang member ran

20  after some rival gang members and was brandishing the firearm at them.

21  The ongoing nature of defendant Barajas's criminal activity, and the particularly violent crimes

22  he is known to have directly committed, demand a weighty sentence to promote respect for the law and

23  to provide just punishment.

24  **C.    The Need for Specific & General Deterrence**

25  The sentence must advance specific and general deterrence as well.  *See* 18 U.S.C. §

26

27  _____

[2]  A fundamental aspect of being a Sureño gang member is a commitment to attack and kill rival

28  Norteños.  The August 2012 murder represented a manifestation of this long-time commitment.

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD

10

3553(a)(2)(B), (C).  A substantial sentence of imprisonment is needed to advance general deterrence.

Defendant Barajas's family or friends may be present at the sentencing.  Whatever prison term the Court

selects will be discussed in Sureño gangs in San Jose for years to come.  The sentence should make clear

that the federal government, and federal courts, will not tolerate gang violence.  Although there was only

one shooter in this case, the defendant played an instrumental role in the homicide.  In fact, the gang

itself played an instrumental role.  A lengthy sentence is required to show other gang members that if

they support violence perpetrated by their fellow gang members, even when they themselves stop short

of being among the more violent actors within their gang, they will suffer significant legal

consequences.

### CONCLUSION

For all of the foregoing reasons, the government respectfully recommends that the Court

sentence the defendant at the low end of the applicable Guidelines range, which is 444 months

imprisonment.  The government also recommends a five-year supervised release term and a $400

Special Assessment.


Dated:  May 14, 2015                                    Respectfully submitted,

                                                       MELINDA HAAG
                                                       United States Attorney


                                                             /s/
                                                       STEPHEN MEYER
                                                       DANIEL KALEBA
                                                       Assistant United States Attorneys

GOVT'S SENTENCING MEMORANDUM
NO. 12-CR-0723 EJD